# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANIKA HUNTE, *as administratrix of the*
*estate of Aries Peterson*, *et al.*,
      Plaintiffs,

      v.

ABBOTT LABORATORIES, INC.,
      Defendant.

No. 3:20-cv-1626 (SRU)

## <u>ORDER</u>

      This is a case about infant formulas that contain cow's milk. This is the second case

before me in quick succession that has raised similar issues. The first—*Ferry v. Mead Johnson*

*& Co., LLC, et al.*, No. 3:20-cv-99 (SRU)—was voluntarily dismissed just a few months ago.

      The main plaintiff in this case is Anika Hunte ("Hunte"), who is administratrix of the

estate of her late son, Aries Peterson ("Aries").[1] Aries was born prematurely and spent his entire

three-month life in the Neonatal Intensive Care Unit ("NICU") at Yale New Haven Hospital

("YNHH"). The defendant, Abbott Laboratories, Inc. ("Abbott"), manufactures several infant

formulas for premature infants that contain cow's milk. In this case, medical professionals fed

Aries three of Abbott's cow's-milk-based infant formulas. Hunte alleges that those formulas

caused Aries to develop necrotizing enterocolitis ("NEC"), which is an intestinal disease that

affects primarily premature infants, and to die. Hunte further alleges that Abbott knew (or

should have known) that its formulas were unreasonably dangerous but, nevertheless, continued

selling and distributing them.

---

[1]     Hunte and Dane Peterson—Aries' parents—are also plaintiffs in their individual capacities. In those
capacities, Hunte and Peterson assert claims for loss of filial consortium (counts four and five). For ease of
reference—and because Hunte is the only plaintiff for counts one, two, and three—I frequently refer to the plaintiffs
as "Hunte." The Clerk is respectfully directed to amend this case's caption to include two more plaintiffs: Anika
Hunte and Dane Peterson. In addition, the Clerk is respectfully directed to amend this case's caption to alter
Hunte's representative title from "administrator" to "administratrix."

Hunte sues Abbott for (1) violating the Connecticut Product Liability Act ("CPLA"), Conn. Gen. Stat. § 52-572m, *et seq.*, on several theories, (2) intentional misrepresentation under Connecticut common law, (3) violating the Connecticut Unfair Trade Practices Act ("CUTPA"), *id.* § 42-110a, *et seq.*, and (4) loss of filial consortium under Connecticut common law (two counts).  Abbott has made a motion to dismiss Hunte's complaint nearly in its entirety.  For the following reasons, I **grant in part and deny in part** Abbott's motion to dismiss, as set forth in the following table.  I also **deny** Abbott's motion to strike several allegations in Hunte's amended complaint.

| Count | Claim | Action on MTD |
|-------|-------|---------------|
| 1 | CPLA – failure to warn (strict liability) | Denied without prejudice (subject to certification) |
| 1 | CPLA – design defect (strict liability) | N/A |
| 1 | CPLA – negligence ((a) negligent design and (b) negligent post-sale duty to warn) | Denied |
| 1 | CPLA – negligent misrepresentation | Granted |
| 1 | CPLA – breach of express warranty | Granted |
| 2 | Intentional Misrepresentation | Granted |
| 3 | CUTPA | Granted |
| 4, 5 | Loss of Filial Consortium | Denied without prejudice (subject to certification) |

## I.       Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities*

*Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).  When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (cleaned up).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely."  *Id.* at 556 (cleaned up).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a district court must be mindful not to violate the "conversion rule."  "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  The major harm of considering extrinsic materials on a Rule 12(b)(6) motion is "the lack of notice

that the material may be considered." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). Thus, when the plaintiff "has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *See id.* (cleaned up).

In the Second Circuit, a court may consider extrinsic materials on a Rule 12(b)(6) motion without converting it to a Rule 56 motion if the materials are either (1) integral to the complaint, or (2) facts appropriate for judicial notice. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006); *see also Chernosky v. Amica Mut. Ins. Co.*, 2018 WL 529956, at *1 n.1 (D. Conn. Jan. 24, 2018) ("The Court may consider documents attached to, integral to, or incorporated by reference in the complaint.") (citing Fed. R. Civ. P. 10(c); *Chambers*, 282 F.3d at 153). For materials to be "integral" to a complaint, the plaintiff must have relied on those materials in drafting the complaint; it is not enough that the plaintiff had mere notice or possession of them. *See Glob. Network Commc'ns*, 458 F.3d at 156 (citing *Chambers*, 282 F.3d at 153). Courts may take judicial notice of facts "not subject to reasonable dispute" either because they are generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court "does not ordinarily look beyond the complaint and attached documents in deciding a motion to dismiss brought" pursuant to Rule 12(b)(6). *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011).

## II. Background

### A. Related Case: *Ferry v. Mead Johnson & Co., LLC, et al.*, No. 3:20-cv-99 (SRU)

In many ways, this case is "take two" of the *Ferry* case. In *Ferry*, the same plaintiffs' lawyers represented the mother of a premature infant who died in the NICU at YNHH after being

fed infant formulas that contained cow's milk, including Similac Special Care, which is one of the three formulas at issue in this case. The same defense lawyers represented Abbott. (Mead Johnson, which was a defendant in *Ferry*, is not a defendant in this suit.) In *Ferry*, the plaintiff alleged that Abbott violated the CPLA on the following theories: (1) failure to warn and/or instruct, (2) design defect (strict liability), (3) negligence, (4) negligent and intentional misrepresentation, and (5) breach of express and implied warranties. *See* Am. Compl., *Ferry*, 20-cv-99, Doc. No. 50, at ¶ 113.

In January 2021, I granted in part and denied in part Abbott's motion to dismiss in the *Ferry* case. *See Ferry v. Mead Johnson & Co., LLC*, 514 F. Supp. 3d 418 (D. Conn. 2021). I recount here the relevant portions of the *Ferry* ruling.

I deferred ruling on Ferry's CPLA claim based on a failure to warn theory because "[t]he threshold question . . . is whether the warnings on the Defendants' products must have been adequate to warn medical professionals or, rather, consumers (*i.e.*, parents of premature infants)." *Id.* at 432. "The answer depend[ed] on whether the learned intermediary doctrine applie[d]." *Id.* Because the parties disagreed regarding whether the learned intermediary doctrine applied—and thus to whom the defendants' duty to warn ran—I planned to certify that question to the Connecticut Supreme Court. *See id.* at 433. Because Ferry voluntarily dismissed his case in April 2021, that issue died on the vine.

With respect to Ferry's CPLA claim based on a design defect (strict liability) theory, I noted that it was a "close question whether federal law preempts Ferry's claim." *Id.* at 438. Because the issue was one of first impression under the Infant Formula Act—and because I was "left with several questions regarding the relevant regulatory regime"—I denied the defendants' motion to dismiss. *Id.* at 438–43.

With respect to Ferry's CPLA claim based on a negligence theory, I noted that Ferry "appear[ed] to assert a CPLA claim based, in part, on a broad theory of negligence relating to numerous disparate topics." *Id.* at 430 n.4. Based on Ferry's allegations and arguments, I concluded that "it seem[ed] clear that Ferry's 'negligence' theory consist[ed] of a negligent failure to warn theory." *Id.* Thus construed, I deferred ruling on Ferry's CPLA claim insofar as it was based on a negligence theory.

With respect to Ferry's misrepresentation and warranty claims, I granted the defendants' motions to dismiss. *See id.* at 450–52. Ferry had not stated a claim for intentional misrepresentation because he had not plausibly alleged (1) that a "false statement was made to induce the other party to act on it" or that "the latter did so act on it to his injury," or (2) a strong inference of scienter. *Id.* at 450–51 (cleaned up). Ferry had not stated a claim for negligent misrepresentation both because (1) his negligent misrepresentation claim sounded in fraud and, thus, failed for the same reasons as Ferry's intentional misrepresentation claim, and (2) even if his negligent misrepresentation claim did not sound in fraud, Ferry did not allege that the infant's "parents (or the YNHH doctors) relied on any of the Defendants' misrepresentations." *Id.* at 451. Ferry had not plausibly alleged any claims for breach of an express warranty because, with respect to the two marketing statements "that could even inferentially be the basis of any warranty," Ferry had "not allege[d] any facts regarding the relationship between those statements and the purchase or use of [the relevant exempt infant formula] in this case." *Id.* Nor had Ferry stated a claim for breach of implied warranty of merchantability or fitness for a particular purpose. *See id.* at 452.

    B.    <u>Factual Background</u>

On January 30, 2018, Aries was born at YNHH. Aries weighed 620 grams and had been born at 27 weeks' gestation (just over six months). Aries spent his entire life in the NICU at YNHH. Aries died on April 18, 2018. The food that Aries ingested during his life is the subject of this lawsuit.

Aries was fed both Hunte's breastmilk[2] and three of Abbott's products: Similac NeoSure ("NeoSure"), Similac Human Milk Fortifier ("Similac HMF"), and Similac Special Care. All three formulas are "exempt" infant formulas, which means that they are intended to be fed to premature infants. Am. Compl., Doc. No. 44, at ¶ 55.[3] All three formulas contain cow's milk, which Hunte alleges causes NEC. Hunte alleges that Abbott's three "cow's milk-based formula products did cause [] Aries to develop NEC, which triggered severe intestinal disease and death." *Id.* at ¶ 101. Hunte notes that exempt infant formulas need not contain cow's milk: At least one other exempt infant formula (made by Prolacta Bioscience) contains human donor milk. *Id.* at ¶ 104.

On February 16, Aries was fed a combination of breastmilk and NeoSure. *Id.* at ¶ 70. Later that evening, Aries had bloody stool. *Id.* at ¶ 71. From February 22 through 26, Aries was fed Similac HMF. *Id.* at ¶ 85. On February 25—and for some indeterminate time thereafter— Aries was fed Similac Special Care. *Id.* at ¶ 91.

Hunte reproduces the warning labels for all three formulas. *Id.* at ¶¶ 81 (NeoSure), 89 (Similac HMF), and 95 (Similac Special Care). None mentions NEC or the possibility that using the product could increase the risk of a baby's developing NEC. Hunte does not allege that she saw—or even tried to see—any of those warning labels. NeoSure and Similac Special Care can

---

[2] Following Aries' birth, Hunte "successfully pumped her own breast milk, and produced a significant supply sufficient for her baby's nutrition." Am. Compl., Doc. No. 44, at ¶ 69.

[3] *Exempt Infant Formulas Marketed in the United States by Manufacturer and Category*, FOOD AND DRUG ADMIN., https://www.fda.gov/food/infant-formula-guidance-documents-regulatory-information/exempt-infant-formulas-marketed-united-states-manufacturer-and-category (last updated Dec. 3, 2019).

be bought at retail stores.  *Id.* at ¶¶ 78, 94.  Hunte never alleges that she ever attempted to buy either.

Most of Hunte's complaint focuses on topics not directly at issue in this case.  For instance, Hunte alleges that a growing corpus of scientific research over the past several decades has established that infant formulas containing cow's milk help cause NEC and death in premature infants.  *Id.* at ¶¶ 8–25 (citing scientific studies, governmental reports, and policy statements between 1990 and 2017).  In fact, according to Hunte, that harm is avoidable:  Infant formulas need not contain cow's milk and, for instance, might instead be "derived from human milk."  *Id.* at ¶ 10.  Hunte spends many paragraphs recounting Abbott's general marketing practices and claiming that those practices were deceptive in various ways—generally, by equating Abbott's products with breastmilk, claiming that Abbott's products were the first choice of doctors, and subtly inferring that Abbott's products were necessary for premature infants to grow properly.  *Id.* at ¶¶ 26–66.  Hunte alleges that Abbott knew that advertising was false.  *See id.* at ¶ 151 ("Abbott has known that their Similac products are significantly increasing the risk of NEC and/or death in premature infants and are aware that there are alternatives to their cow's milk-based formulas and fortifiers, such as human milk derived products, that would reduce the risk of NEC and/or death, yet they chose to continue to promote, market, and sell their products, causing thousands of premature infants to succumb to NEC and die.").

"All this marketing and promotion," according to Hunte, "is designed to instill confidence in Abbott's product lines, and indeed to plant a subtle seed in a parent's mind that formula is safe and necessary to the growth of a premature infant."  *Id.* at ¶ 75.  Hunte alleges that, in general, she "was exposed [to] and persuaded by marketing from Abbott that Similac products were safe and necessary to the growth and nutrition of her premature infant."  *Id.* at ¶

8

76.  Hunte also alleges that she "was enticed into joining *Similac Strong Moms Rewards*," which appears to have been a mailing list for formula coupons.  *Id.* at ¶ 166.  Hunte alleges that, through her membership in *Similac Strong Moms Rewards*, Abbott "gained access to substantial private information" about Hunte and targeted her with ads, such as a January 18 email,[4] which Hunte received while she was hospitalized.  *Id.* at ¶¶ 167–68.  Importantly, Hunte does not allege that she ever saw or read that email—only that she received it.  *See id.* at ¶ 168.

Hunte alleges very few facts regarding the three formulas at issue and no facts regarding the connection between the advertising of those three formulas and Hunte.  So far as I can tell, Hunte makes no specific allegations regarding Similac HMF or Similac Special Care.  With respect to NeoSure, Hunte's allegations are general, vague, and not clearly relevant.  For instance, Hunte cites to Similac's website and notes that "Similac promotes *Neosure*" without mentioning NEC.  *Id.* at ¶¶ 57–58; 73–74.  Hunte also performed "Google search[es]" for "feeding preemies formula," "Is formula healthy for premature infants?" and "Is formula safe for premature infants?"; Hunte notes that paid advertisements for NeoSure appeared in response to each search.  *Id.* at ¶¶ 56, 59–60.  Those advertisements do not mention NEC.

The following few paragraphs of Hunte's complaint provide a helpful summary of the connection, in Hunte's view, between Abbott's generalized advertising and Aries' death:

> The pervasive exposure by mothers to media, advertising and promotion equating human milk to breastmilk has the generalized impact of: (a) reducing lactation; (b) causing mothers to believe formula is comparable to breastmilk; and (c) reduc[ing] the capacity for informed consent and informed decision-making. Through long-term exposure to Abbott's advertising, [] Aries['] mother had been conditioned and was caused to believe that Similac products are suitable alternatives to breastmilk and necessary supplements for low birth weight infants.

*Id.* at ¶ 36.

---

[4]      Hunte does not allege much regarding the contents of that January 18 email.  Hunte alleges only that "[t]he email contains various links which are designed to message the quality of Abbott's brands and control the message regarding the nutritional needs of babies."  Am. Compl., Doc. No. 44, at ¶ 168.

Abbott has designed a systematic, powerful and misleading marketing campaign to deceive mothers to believe that: (1) cow milk formula and fortifier is safe; (2) cow-milk products are equal, or even superior, substitutes to breastmilk; and (3) Physicians consider their cow's milk-based products a first choice. Similarly, Abbott has marketed its products for premature infants as necessary for "catch-up growth", and perfectly safe for premature infants, despite knowing of the extreme risks posed by cow's milk-based products relative to the deadly disease of NEC with regard to premature infants and cow products. Anika Hunte was exposed to this deception, and was caused to believe this deception, all [of] which substantially contributed to her baby being fed the defendant's cow milk products.

*Id.* at ¶ 65.

Members of the medical community, physicians, and hospitals, as well as the parents, relied upon the representations and advertising of the defendant, which categorically omit that their cow's milk-based products significantly increase the risk of NEC and death in premature infants, which contributed to the product being fed to [] Aries.

*Id.* at ¶ 66.

C.    Procedural Background

When Hunte filed this case in October 2020, it was originally assigned to District Judge Jeffrey A. Meyer. Because this case was related to *Ferry* (which was removed in January 2020), it was transferred to me. *See* Order of Transfer, Doc. No. 19. Just as in *Ferry*, there are two parallel *Hunte* cases. This case, filed in October 2020, is the earlier of the two. The second, filed in December 2020, is a state court case against YNHH (the "YNHH Case").[5] The YNHH Case is now in discovery. Notably, in her complaint in the YNHH Case, Hunte alleges that she explicitly instructed YNHH doctors not to feed Aries any formula that contained cow's milk. *See* YNHH Case Compl., Ex. 1 to Abbott's Mem. of Law, Doc. No. 45-2, at ¶ 9 ("Aries' mother articulated to the medical staff at Yale New Haven Hospital a strong desire that her baby only be fed human milk and expressly instructed that her baby not be fed cow-based products.").

---

[5]      *See* Superior Court Case Look-up, ST. OF CONN. JUDICIAL BRANCH, http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=NNHCV216110213S (docket NNH-CV21-6110213-S) (last visited Aug. 19, 2021).

In this case, on February 9, 2021, I held a Rule 16 pretrial conference.  *See* Min. Entry, Doc. No. 36.  At that time, I ordered that Hunte could file an amended complaint.  *See* Conf. Mem. and Order, Doc. No. 37.  On February 26, Hunte filed that amended complaint, which is the operative complaint.  *See* Am. Compl., Doc. No. 44.  On April 1, Abbott made a motion to dismiss the complaint and a motion to strike the scandalous allegations in it.  *See* Mot. to Dismiss and Strike, Doc. No. 45; Abbott's Mem. in Supp. of Mot. to Dismiss and Strike, Doc. No. 45-1 ("Abbott's Mem. of Law").  On April 22, Hunte filed an opposition.  *See* Hunte's Opp'n, Doc. No. 53.  On May 6, Abbott filed a reply.  *See* Abbott's Reply, Doc. No. 54.

Separately, on April 2, Hunte made a motion for certification, in which she asked me to certify the following question of law to the Connecticut Supreme Court:  "Under Connecticut law, should the learned intermediary doctrine be extended to apply to the infant formulas at issue in this case?"  Mot. to Certify, Doc. No. 47, at 1.  On April 13, the parties submitted notices regarding their disagreement over a plan for limited discovery on certain issues, including the learned intermediary doctrine issue.  *See* Notices, Doc. Nos. 48 and 49.  At a status conference on April 15, with the agreement of both parties, I decided to address the instant motion to dismiss "before attending to issues of discovery or potential certification of any state law issues to the Connecticut Supreme Court."  Conf. Mem. and Order, Doc. No. 52.  I stayed discovery until I decided the instant motion to dismiss.  *See id.*  On May 20, I held a hearing on the motion to dismiss and took it under advisement.  *See* Min. Entry, Doc. No. 56; Hr'g Tr., Doc. No. 57.

## III.  Discussion

Abbott asks me to "dismiss with prejudice the entire amended complaint except for the design defect claim on which the Court deferred ruling in *Ferry*" and to "strike the allegations" that are scandalous and inflammatory and serve no legitimate purpose.  Abbott's Mem. of Law,

Doc. No. 45-1, at 6.  More specifically, Abbott asks me to "apply the *Ferry* ruling here" by "(a) dismiss[ing] all misrepresentation and breach of warranty claims with prejudice; (b) defer[ing] ruling on preemption of design defect claims; and (c) if the failure to warn claim survives . . . , stay that claim until after the Connecticut Supreme Court decides the learned intermediary issue." *Id.* at 8–9.  In opposition, Hunte claims that "Abbott caused [Aries'] death by knowingly marketing an unsafe product, failing to warn of the risk of that product, failing to act as a reasonable manufacturer, and intentionally misrepresenting the benefits of that product through a deceptive marketing scheme."  Hunte's Opp'n, Doc. No. 53, at 1.  For the reasons described below, I **grant in part and deny in part** Abbott's motion to dismiss, as set forth in the table above.  I also **deny** Abbott's motion to strike because the allegations that Abbott argues are scandalous are really not.

A.    CPLA claim (¶¶ 107–52)

The CPLA is the "exclusive remedy" for—and the only cause of action available to—plaintiffs in Connecticut for product liability claims.  *See Greco v. Broan-NuTone LLC*, 2020 WL 1044002, at *9 (D. Conn. Mar. 4, 2020); *Lynn v. Haybuster Mfg., Inc.*, 226 Conn. 282, 292 (1993); *see also* Conn. Gen. Stat. § 52-572n(a).  Even though the CPLA provides for only a single cause of action, a plaintiff may "assert various common law theories of liability thereunder."  *Phila. Indem. Ins. Co. v. Lennox Indus., Inc.*, 2019 WL 1258918, at *2 (D. Conn. Mar. 18, 2019) (cleaned up).  The available theories of liability include:  (1) strict liability in tort, (2) negligence, (3) breach of warranty, express or implied, (4) breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent, and (5) misrepresentation or nondisclosure, whether negligent or innocent.  *See* Conn. Gen. Stat. § 52-572m(b).  Because the CPLA does not "alter the substance of a plaintiff's rights . . . any sub-claim brought under the

CPLA . . . must sufficiently allege all elements that would be required at common law." *Phila.*

*Indem.*, 2019 WL 1258918, at *2 (citing *LaMontagne v. E.I. Du Pont De Nemours & Co., Inc.*,

41 F.3d 846, 855 (2d Cir. 1994)).

All product liability claims brought in Connecticut "are governed by the same elements."

*Bifolck v. Philip Morris*, 324 Conn. 402, 433–34 (2016). That is, a plaintiff must prove:

> (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition.

*Id.* at 434 (quoting *Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 184–85 (2016)).

Hunte alleges that Abbott violated the CPLA on the following five theories: (1) failure to

warn and/or instruct, (2) strict liability for design defect, (3) negligence, (4) negligent

misrepresentation, and (5) breach of express warranty. I will address each in turn.

### 1. Failure to Warn and/or Instruct (¶ 152(A)(a)–(ff))

Courts evaluating a failure to warn claim engage in a three-step analysis. *See Karavitis v.*

*Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 252–53 (D. Conn. 2017). First, a plaintiff must satisfy

the five elements governing all product liability claims, as described above. *See id.* at 252.

Second, the plaintiff must show that product instructions or warnings "were required, and . . .

[that] they were adequate." *Id.* In that determination, the following factors are relevant: "(1)

[t]he likelihood that the product would cause the harm suffered by the claimant; (2) the ability of

the product seller to anticipate at the time of manufacture that the expected product user would

be aware of the product risk, and the nature of the potential harm; and (3) the technological

feasibility and cost of warnings and instructions." *Id.* at 252–53 (quoting Conn. Gen. Stat. § 52-

572q(b)). Third, a plaintiff must establish that "if adequate warnings or instructions had been

provided, the claimant would not have suffered the harm." *Id.* at 253 (quoting Conn. Gen. Stat. § 52-572q(c)).

"Under the CPLA, a product seller is liable for a plaintiff's injuries when a product lacks adequate warnings directed to the person best positioned to keep the plaintiff from being hurt, and if the plaintiff would not have been injured if the warnings had been provided." *Klorczyk v. Sears, Roebuck & Co.*, 2019 WL 1433645, at *13 (D. Conn. Mar. 29, 2019) (citing Conn. Gen. Stat. § 52-572q). "Warnings must specifically identify for the user the danger inherent in the product's use." *Id.* at *14 (quoting *Giglio v. Conn. Light & Power Co.*, 180 Conn. 230, 237 (1980)); *see also Fraser v. Wyeth, Inc.*, 992 F. Supp. 2d 68, 81 (D. Conn. 2014) ("An overly broad or confusing warning will not suffice to discharge a prescription drug manufacturer's duty to adequately warn a prescribing physician, nor is the mere mention or equivocal reference to a particular injury sufficient.") (cleaned up).

Hunte claims that Abbott violated the CPLA by failing to properly warn "hospitals, NICUs, doctors, parents and/or consumers" about the risks of NEC associated with use of its products. Am. Compl., Doc. No. 44, at ¶ 152(A)(a). "As a result of the inadequacy of the warnings and the pervasive marketing suggesting the safety and necessity of their products, [] Aries was fed cow's milk-based products which caused him to develop NEC and ultimately die." *Id.* at ¶ 152(A)(ee). Hunte claims that if she had "known of the significant risks of feeding Similac" to Aries, or if she had "not been exposed to this pervasive marketing, convincing [her] of Similac's safety and necessity," she would not have allowed YNHH doctors to feed Similac products to Aries. *Id.* at ¶ 137.

In *Ferry*, the plaintiff made a virtually identical claim to the one that Hunte makes here. In *Ferry*, I declined to evaluate the plaintiff's failure to warn claim because it depended on a

"threshold question": "whether the warnings on the Defendants' products must have been adequate to warn medical professionals or, rather, consumers (*i.e.*, parents of premature infants)." *Ferry*, 514 F. Supp. 3d at 432. The answer depended on "whether the learned intermediary doctrine applies," and the parties disagreed about whether it did. *Id.* "Because of the issue's importance, the possibly broad effect of any potential answer, and the fact that resolving it will involve weighing policy considerations—and because Connecticut law does not shed light on the issue," I indicated that I would certify that question to the Connecticut Supreme Court. *Id.* at 433. However, *Ferry* was voluntarily dismissed before I issued a certification order.

In this case, the parties again disagree regarding whether the learned intermediary doctrine applies.[6] For essentially the same reasons that I set forth in *Ferry*, I **deny without prejudice** Abbott's motion to dismiss Hunte's CPLA claim based on a failure to warn theory. Instead, I will certify that issue of law to the Connecticut Supreme Court.

Abbott's argument in favor of dismissal—rather than certification—is limited to the assumed scenario in which the learned intermediary doctrine does not apply (and thus the duty to warn runs to Aries' parents). *See* Abbott's Mem. of Law, Doc. No. 45-1, at 9–10; *see also* Hr'g Tr., Doc. No. 57, at 7:3–7 (Abbott's counsel noting that "my argument on this point assumes, assumes away the learned intermediary doctrine and says if a warning had to be given to the plaintiff, if that was our duty, the plaintiff hasn't alleged that third element of causation"). Apparently, Abbott so limits its argument because Hunte argues that the learned intermediary

---

[6] *Compare* Abbott's Mem. of Law, Doc. No. 45-1, at 9 ("As the Court knows, the parties dispute whether Abbott was responsible for warning the parents (as Plaintiffs argue) or the infant's doctors (as the learned intermediary doctrine dictates).") *with* Hunte's Opp'n, Doc. No. 53, at 7 ("Plaintiffs' position is that the learned intermediary doctrine does not apply.").

doctrine does not apply, and so Abbott seeks to show that, even on Hunte's own terms, her claim fails.

Regardless of the merit of that argument (which I do not address here), it is flawed at the outset. Although Hunte certainly argues that the learned intermediary doctrine does not apply and, thus, the duty to warn runs to Aries' parents, Hunte also alleges and argues that Abbott failed to warn medical professionals. *See* Am. Compl., Doc. No. 44, at ¶ 152(A)(a) (alleging that Abbott "failed to properly warn hospitals, NICUs, doctors, parents and/or consumers that its cow's milk-based product significantly increases the risk of NEC and death in these babies"); Hunte's Opp'n, Doc. No. 53, at 7 ("Regardless of whether the warnings were appropriately directed to [] Aries's doctor or to his parents, however, Plaintiffs have adequately stated a claim for failure to warn."). Because Abbott makes no argument about why the relevant warnings might have been inadequate to warn medical professionals, there is no reason to dismiss Hunte's claim on that theory. Granting Abbott's motion to dismiss would require me to conclude, as a matter of law, that the learned intermediary doctrine does not apply. Abbott offers no reason why I should reach that conclusion.

Instead, that issue will be a subject of my certification order to the Connecticut Supreme Court. However, I will allow for a different pre-certification procedure here than I did in *Ferry*. Although, in *Ferry*, I asked the parties to engage in limited discovery on discrete issues in advance of my certification order, *see Ferry*, 514 F. Supp. 3d at 433, I will not do the same here. Instead, the parties shall have 30 days—until **September 20, 2021**—to stipulate to a statement of facts. *See* Conn. Gen. Stat. § 51-199b(g). If the parties cannot agree, they should merely report by written notice that they cannot agree. In that case, I will identify the facts relevant to the

certified issue. *See id.* I anticipate that my determination of the relevant facts will be identical

(or substantially identical) to the "Factual Background" section of this ruling.[7]

       2.       Strict Liability for Design Defect (¶ 152(B)(a)–(w))

Based on my ruling in *Ferry*,[8] Abbott does not move to dismiss Hunte's CPLA claim

based on a design defect theory and, instead, asks that I "defer ruling on preemption of design

defect claims." Abbott's Mem. of Law, Doc. No. 45-1, at 8; Abbott's Reply, Doc. No. 54, at 5–

7. Because Abbott does not argue that this claim should be dismissed, it survives.

       3.       Negligence (¶ 152(C)(a)–(ss))

"To prevail on a claim for negligence under the CPLA, a plaintiff must establish: '(1)

duty; (2) breach of that duty; (3) causation; and (4) actual injury.'" *Leonard v. Gen. Motors*

---

[7]     That pre-certification procedure complies with Connecticut's certification statute, which reads, in relevant part: "If the parties cannot agree upon a statement of facts, then the certifying court shall determine the relevant facts and shall state them as a part of its certification order." Conn. Gen. Stat. § 51-199b(g). Connecticut federal courts do not typically certify questions of law at the motion to dismiss stage. However, in at least one other case—*Gerrity v. R.J. Reynolds Tobacco Co.*, 263 Conn. 120 (2003)—a district court took a similar approach to the one I take here. In *Gerrity*, the Connecticut Supreme Court accepted a certified question from District Judge Dominic J. Squatrito that was certified at the motion to dismiss stage. *See* Certification Order, *Gerrity v. RJ Reynolds Tobacco, et al.*, No. 3:99-cv-1329, Doc. No. 94 (confirming as much, although the actual certification order is unavailable on the case's public docket). In accepting certification, the *Gerrity* Court described the district court's certification order as follows:

> The District Court's certification order includes the question of law sought to be answered by this court and a list of six allegations. Although not stipulating to the allegations as facts to be taken as true, the defendants agree that the plaintiff *asserts* these allegations in his complaint. The following summary of the case, as set forth in this opinion, is based on the District Court's certification order and an examination of the plaintiff's underlying complaint.

*Gerrity*, 263 Conn. at 123. If the parties cannot agree on a statement of facts, I intend to take a similar approach in my certification order in this case: I will identify the relevant facts (substantially as set forth in the "Factual Background" section of this ruling), and the Connecticut Supreme Court may rely on the allegations in Hunte's amended complaint to whatever extent it wishes.

[8]     In *Ferry*, the defendants argued that the plaintiff's CPLA claim based on strict liability for a design defect was preempted by federal law. I acknowledged that the issue was a close one, but I was "left with several questions regarding the relevant regulatory regime that prevent me from granting the Defendants' motions to dismiss on this ground." *Ferry*, 514 F. Supp. 3d at 440. Here, Hunte asserts a highly similar design defect claim. *See* Am. Compl., Doc. No. 44, at ¶ 152(B)(a)–(w). The only difference is that, in this case, Hunte alleges liability both on a *post*-submission theory—that Abbott is liable based on not changing design as the science became clearer, *id.* at ¶ 152(B)(a)–(q)—and (this is the new part) on a *pre*-submission theory—that Abbott is also liable based on the way the at-issue products were designed *in the first place*, many decades ago, *id.* at ¶ 152(B)(r)–(v). Because Abbott does not raise an issue regarding the distinction, I do not address it.

*LLC*, 504 F. Supp. 3d 73, 93 (D. Conn. 2020) (quoting *Walters v. Howmedica Osteonics Corp.*, 676 F. Supp. 2d 44, 51 (D. Conn. 2009)). "Under Connecticut law, the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." *Id.* at 93–94 (cleaned up).

In her amended complaint, Hunte alleges that Abbott was negligent in "one or more of" about 45 different ways. *See* Am. Compl., Doc. No. 44, at ¶ 152(C)(a)–(ss). In *Ferry*, the plaintiff did something similar, to a lesser extent. *See* Am. Compl., *Ferry*, 20-cv-99, Doc. No. 50, at ¶ 113(C)(a)–(o). In *Ferry*, the plaintiff did not discuss his negligence claim separately from any other claim. However, based on Ferry's complaint and a few passing references in his opposition, I construed Ferry's negligence theory as a negligent failure to warn theory. *See Ferry*, 514 F. Supp. 3d at 430 n.4. Because I reserved ruling on Ferry's CPLA claim based on a failure to warn theory pending the outcome of my certification order, I did not opine further on the issue.

In this case, Hunte spends significant time in her opposition clarifying her negligence theory. More specifically, Hunte asserts two sub-theories of negligence: (1) negligent design and (2) negligent breach of a post-sale duty to warn, study, and reduce adverse effects. *See* Hunte's Opp'n, Doc. No. 53, at 10–14. Hunte's negligent design theory is a close cousin of Hunte's strict liability design defect theory: Hunte alleges that Abbott's including cow's milk in its infant formulas was unreasonable. *See* Hunte's Opp'n, Doc. No. 53, at 11–12 (citing Am.

Compl., Doc. No. 44, at ¶ 152(C)(a)–(e), (k), (y), (z), (dd)–(ee)).  In her negligent post-sale duty to warn claim, Hunte alleges that, given what Abbott came to understand, it was unreasonable for Abbott not to "contact the FDA, NICUs, hospitals, and/or to inform them that its product was linked to causing NEC and death."  Hunte's Opp'n, Doc. No. 53, at 12–13; *see also* Am. Compl., Doc. No. 44, at ¶¶ 125, 152(C)(q), (u), (w).  Relatedly, Hunte alleges that Abbott tortiously failed to investigate adverse events resulting from use of its infant formulas.  *See* Hunte's Opp'n, Doc. No. 53, at 13–14; *see also* Am. Compl., Doc. No. 44, at ¶¶ 125, 132, 148, 152(C)(aa)–(bb), (dd)–(ee), (ii)–(nn).

Abbott's only argument regarding Hunte's CPLA negligence claim is that it violates Rule 8.  *See* Abbott's Reply, Doc. No. 54, at 11–12.  On the merits, Abbott writes that "[i]n its substance, the negligence claim just repeats other claims in the case, painting a negligence gloss on them," so "[t]he negligence versions of Plaintiffs' claims should be dismissed for the same reasons as the non-negligence versions."  *Id.* at 12.

I will not dismiss Hunte's CPLA negligence claim.  Abbott's argument rests on the notion that Hunte has not alleged any other plausible theories for relief under the CPLA.  But, as described above, that is incorrect.  For instance, I have already explained that I will not at this time dismiss Hunte's CPLA claim based on (1) strict liability for a design defect and (2) failure to warn.

With respect to (1), not even Abbott argues that I should dismiss Hunte's CPLA claim based on strict liability for a design defect.  In any event, a theory of negligent design is slightly different from a theory of strict liability for a design defect.  *See Leonard*, 504 F. Supp. 3d at 93 ("Unlike strict liability, which focuses on the product itself and finds the manufacturer liable if the product is defective, negligence centers on the manufacturer's conduct.") (quoting *Phila.*

*Indem. Ins. Co. v. Lennox Indus., Inc.*, 2020 WL 705263, at *6 (D. Conn. Feb. 12, 2020)).

Abbott offers no argument why, on the merits, Hunte has not stated a plausible claim for

negligent design. In my view, Hunte has stated such a claim: She alleges that Abbott knew of

the dangers of NEC and death that resulted from the use of its cow's milk-based products, but

continued to produce, sell, and distribute them without warning. *See id.* at 94; *see also, e.g.*, Am.

Compl., Doc. No. 44, at ¶¶ 79–80, 90, 95, 99, 105–06.

With respect to (2), I also will not dismiss Hunte's CPLA negligence claim to the extent

that it asserts a sub-theory of negligent failure to warn post-sale. In Connecticut, a manufacturer

has a post-sale duty to warn. *See Densberger v. Utd. Techs. Corp.*, 297 F.3d 66, 71 (2d Cir.

2002) ("Because the CPLA does not expressly prohibit post-sale liability for negligent failure to

warn, the negligence-based common law duty survives and is cognizable under the statute.");

*Simoneau v. Stryker Corp.*, 2014 WL 1289426, at *13 n.11 (D. Conn. Mar. 31, 2014) (holding

that post-sale duty to warn exists only in negligence and not in strict liability). In this case,

Hunte alleges that, over time, Abbott became increasingly aware of scientific evidence that

cow's milk causes NEC, but, instead of warning consumers or medical professionals about that

link, continued selling and distributing its cow's milk-based products without warning. Because

Abbott offers no reason why such a claim should be dismissed, I will not dismiss it.

For those reasons, although Hunte's CPLA negligence claim is confusingly pleaded, I

construe it as asserting two sub-theories: (1) negligent design, and (2) negligent failure to warn

post-sale. So construed, I **deny** Abbott's motion to dismiss Hunte's CPLA negligence claim.

4.    Negligent Misrepresentation (¶ 152(D)(a)–(bb))

To make out a claim for negligent misrepresentation, a plaintiff must establish (1) that the

defendant made a misrepresentation of fact (2) that the defendant knew or should have known

20

was false, (3) that the plaintiff reasonably relied on the misrepresentation and thus (4) suffered pecuniary harm. *See McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 536 (D. Conn. 2020) (citing *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006)). Courts disagree about whether the heightened pleading standard of Rule 9(b) applies to negligent misrepresentation claims. *See ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.*, 2018 WL 1368908, at *6 (D. Conn. Mar. 16, 2018) (describing the disagreement). However, courts agree that when "negligent misrepresentation is couched in fraud-like terms of known falsity," the heightened fraud pleading standard applies. *See Karazin v. Wright Med. Tech., Inc.*, 2018 WL 4398250, at *7 (D. Conn. Sept. 14, 2018); *ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.*, 2020 WL 64297, at *2 (D. Conn. Jan. 5, 2020).

In *Ferry*, I held that the plaintiff's "negligent misrepresentation claim sounds in fraud, and so it fails for the same reasons that [the plaintiff's] intentional misrepresentation claim fails." *Ferry*, 514 F. Supp. 3d at 451. Even if the claim did not sound in fraud, though, it would have failed because the plaintiff did not allege that the infant's parents or doctors "relied on any of the Defendants' misrepresentations." *Id.*

Applying the same reasoning here, I reach the same result. Hunte's negligent misrepresentation claim sounds in fraud. In fact, Hunte's negligent and intentional misrepresentation claims are substantially identical.[9] I thus treat Hunte's negligent misrepresentation claim as a fraud claim and dismiss it for the same reasons articulated below regarding count two (intentional misrepresentation). Even if I were to treat Hunte's negligent misrepresentation claim as a non-fraud claim, though, it would fail because Hunte does not

---

[9] *Compare, e.g.*, Am. Compl., Doc. No. 44, at ¶¶ 152(D)(r)–(bb) *with id.* at ¶¶ 164–75 (virtually identical). In other paragraphs, Hunte changes one word: "intentionally" becomes "negligently." *Compare id.* at ¶ 152(D)(g)–(h) *with id.* at ¶¶ 156–57. In still other paragraphs, Hunte changes one phrase: "knowing" becomes "ample evidence whereby defendant should have known." *Compare id.* at ¶¶ 152(D)(l), (n)–(q) *with id.* at ¶¶ 159–63.

plausibly allege that she, Aries' father, or the YNHH doctors reasonably relied on any of Abbott's alleged misrepresentations. *See Nazami*, 280 Conn. at 626 (noting that to prove a negligent misrepresentation claim a plaintiff must establish, *inter alia*, "that the plaintiff reasonably relied on the misrepresentation"); *Stuart v. Freiberg*, 316 Conn. 809, 828–29 (2015) (granting defendant summary judgment on fraud and negligent misrepresentation claims when plaintiff admittedly had not seen the alleged misrepresentations because "[w]ithout *actual* reliance, reasonable reliance cannot possibly exist").

As described above, Hunte's allegations regarding Abbott's marketing are extremely general. Hunte alleges that she was "exposed to some of" the marketing described in the amended complaint. Am. Compl., Doc. No. 44, at ¶ 152(D)(r)–(s). Hunte then alleges that she "was enticed into joining *Similac Strong Moms Rewards*," *id.* at ¶ 152(D)(t), and that she once got an email through her membership in that group, *id.* at ¶ 152(D)(u)–(v). Importantly, Hunte does not allege that she ever saw or read that email, nor does she discuss any statement that Abbott made in that email. *See id.* at ¶ 152(D)(v). Put simply, Hunte has not alleged that she ever reasonably relied on any (mis)representation alleged in the complaint. *Cf. Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296, 316 (D. Conn. 2016) (granting summary judgment to defendant drug manufacturers on negligent misrepresentation claim because plaintiff "has failed to raise a genuine issue of material fact as to whether [the decedent] read and relied on the Motrin warnings," and so plaintiff "cannot show that [the decedent] acted on any false misrepresentations to his injury"). For those reasons, I **grant** Abbott's motion to dismiss Hunte's CPLA claim based on a theory of negligent misrepresentation.

5.    Breach of Express Warranty (¶ 152(E)(a)–(f))

22

To recover for breach of an express warranty, a plaintiff must show (1) that a warranty existed, (2) a breach of that warranty, and (3) damages proximately caused by the breach. *See, e.g.*, *McConologue v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 93, 114 (D. Conn. 2014). A seller of a product can create an express warranty in the following ways:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Conn. Gen. Stat. § 42a-2-313(1). To survive a motion to dismiss a claim for breach of express warranty, a plaintiff must adequately allege the representation that the defendant made and breached and to whom it was conveyed and how. *See, e.g.*, *Phila. Indem.*, 2019 WL 1258918, at *9; *Simoneau*, 2014 WL 1289426, at *14 ("[A] breach of express warranty claim without any reference to the underlying representation lacks plausibility.").

In her amended complaint, Hunte alleges that Abbott "expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated uses, including use by premature infants." Am. Compl., Doc. No. 44, at ¶ 152(E)(b). The parties do not offer any meaningful argument regarding that portion of Hunte's CPLA claim. In fact, although Abbott moved to dismiss Hunte's breach of warranty claims, *see* Mot. to Dismiss and Strike, Doc. No. 45, at 1, Hunte did not address that issue in her opposition brief, *see* Hunte's Opp'n, Doc. No. 53. And, at oral argument, Hunte appeared to abandon the claim. *See* Hr'g Tr., Doc. No. 57, at 26:8–10 ("Your Honor, I don't think we've briefed – that we have not briefed. I'm prepared to abandon that claim, Your Honor."). Thus, in my view, I need not address Hunte's express warranty claim on the merits

23

because I could consider it abandoned. *See Price v. New York State Bd. of Elections*, 540 F.3d 101, 107 n.7 (2d Cir. 2008) (declining to address claim when "plaintiffs abandoned that claim at oral argument"). However, even if I considered the claim, I would **grant** Abbott's motion to dismiss for substantially the same reasons that I granted the defendants' similar motion in *Ferry*.

In *Ferry*, I granted the defendants' motion to dismiss Ferry's CPLA claim based on a breach of express warranty theory. Ferry had "identifie[d] only two statements that could even inferentially be the basis of any warranty," because those were the only two statements made on marketing materials that related to any product at issue in that case. *Ferry*, 514 F. Supp. 3d at 451. Even with respect to those two statements, though, Ferry did "not allege any facts regarding the relationship between those statements and the purchase or use" of the relevant product. *Id.* Thus, I dismissed the claim.

Similarly, here, Hunte has not identified any statement that could be the basis of an express warranty and, even if she had, she has not plausibly alleged that any breach of that warranty proximately caused harm to Aries. With respect to the existence of an express warranty, Hunte does not allege that she or Aries' father ever saw the product labels or warnings of any of the products at issue. Instead, Hunte alleges that because she was "exposed to" Abbott's pervasive marketing, she did not know to prohibit doctors from feeding those products to her baby. *See* Am. Compl., Doc. No. 44, at ¶¶ 65–66, 137. In Connecticut, and elsewhere, "[w]hile advertisements can be part of the basis of the bargain [that forms an express warranty], the plaintiff must show, at a minimum that he or his agent knew of and relied on the statement." *Omega Eng'g, Inc. v. Eastman Kodak Co.*, 30 F. Supp. 2d 226, 246 (D. Conn. 1998); *see also In re NJOY, Inc. Consumer Class Action Litig.*, 2014 WL 12586074, at *18 (C.D. Cal. Oct. 20, 2014) ("General assertions about statements included in a variety of advertisements and on a

24

variety of packages do not state a claim for breach of express warranty.") (construing California, Florida, and New York law); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liability Litig.*, 2018 WL 2765961, at *5 (N.D. Ga. June 8, 2018) (granting defendant summary judgment when plaintiffs, in part, attempted to rely on "general marketing techniques employed by the Defendant over the years to promote" its product because that evidence "does not prove what specific statements were made *to the* [*Plaintiffs*] in this particular case that formed express warranties") (construing Georgia law). Because Hunte's allegations are limited to general marketing materials, Hunte does not plausibly allege a basis for any express warranty.

Even if she had, and even if that warranty were breached, Hunte's breach of express warranty theory would still fail because Hunte has not plausibly alleged that any breach led to Aries' death. In Connecticut, to recover based on a breach of express warranty, the claimed breach must have proximately caused the harm. *See, e.g.*, *Ross & Roberts, Inc. v. Cook's Indus. Lubricants, Inc.*, 1997 WL 835054, at *3 (D. Conn. Sept. 29, 1997) ("To recover in a breach of warranty action, plaintiff must demonstrate . . . that the breach was the proximate cause of the losses sustained."); *Brangi v. Faulkner Phys. Therapy, Inc.*, 1996 WL 106769, at *3 n.2 (Conn. Super. Ct. Feb. 21, 1996) ("Under the theory of express warranty . . . the plaintiff must prove by a fair preponderance of the evidence that the defendant breached the express warranty and that the breach was the proximate cause of the injuries sustained.") (cleaned up). In this case, Hunte's allegations regarding causation are conclusory and implausible. *See* Am. Compl., Doc. No. 44, at ¶ 152(E)(f) ("The aforementioned breached warranties were the proximate cause of [] Aries getting NEC, and the proximate cause of his death."). From the facts that Hunte has pleaded, it is not plausible to infer that Abbott's allegedly negligent or deceptive marketing, in any fair sense, could have proximately caused Aries' death.

25

6.      Punitive Damages (¶ 152(F)(a)–(g))

Hunte alleges that Abbott intentionally, or at least recklessly, undertook the actions already described, and so she is entitled to punitive damages.  Indeed, "[i]n Connecticut, a plaintiff in a product liability action may recover punitive damages if she proves that the compensable harm suffered was a result of the defendant's reckless disregard for the safety of the product's user."  *Izzarelli v. R.J. Reynolds Tobacco Co.*, 767 F. Supp. 2d 324, 325 (D. Conn. 2010) (citing Conn. Gen. Stat. § 52-240b).  The only question is whether, as a formal pleading matter, Hunte properly asserts a standalone "claim" for punitive damages under the CPLA.[10] The answer is inconsequential:  If Hunte succeeds on her CPLA claim and proves that Abbott acted recklessly, she may be entitled to punitive damages.

B.      Intentional Misrepresentation (¶¶ 153–85)

To make out a claim for intentional misrepresentation, a plaintiff must establish "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury."  *456 Corp. v. Utd. Nat. Foods, Inc.*, 2011 WL 87292, at *3 (D. Conn. Jan. 11, 2011) (quoting *Updike, Kelly, & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 643 (2004)).

Because intentional misrepresentation claims sound in fraud,[11] a heightened pleading standard applies.  *See ARMOUR Capital*, 2018 WL 1368908, at *6.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

---

[10]       In *Ferry*, I wrote that "[r]eckless disregard is not a cognizable cause of action under the CPLA," and so it was improper for the plaintiff to plead a standalone punitive damages "claim."  514 F. Supp. 3d at 430 n.5.  As a formal matter, that may have been incorrect.  Although there does not appear to be any appellate authority in Connecticut concerning the issue, some Connecticut lower courts have held that a plaintiff may plead a separate "claim" for punitive damages under the CPLA.  *See Castle v. Boehringer Ingelheim Pharms., Inc.*, 2020 WL 6712426, at *5–6 (Conn. Super. Ct. Sept. 2, 2020) (citing cases).

[11]       Indeed, "[a] cause of action for intentional misrepresentation is essentially a claim of fraud."  *Reid v. Landsberger*, 123 Conn. App. 260, 281 (2010) (cleaned up).

Fed. R. Civ. P. 9(b). That means that the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ARMOUR Capital*, 2018 WL 1368908, at *6 (quoting *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017)) (cleaned up).

When alleging fraud, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Although Rule 9(b) thus indicates that a plaintiff may allege scienter "generally," the Second Circuit has made clear that plaintiffs in fraud cases must "allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). That strong inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

In her intentional misrepresentation claim, Hunte makes almost exactly the same allegations as she does in alleging negligent misrepresentation, except that, here, Hunte alleges that Abbott *knew* what it was doing. Hunte alleges all the same "instances" of reliance: the pervasive marketing over a long period of time, Hunte's joining *Similac Strong Moms Rewards*, and the single email that Hunte received while she was in the hospital. Hunte also adds some allegations regarding why Abbott acted the way it did: Abbott's "marketing campaign was designed to increase profit." Am. Compl., Doc. No. 44, at ¶ 176. Put differently, Abbott "has chosen profit over safety." *Id.* at ¶ 184; *see also id.* at ¶ 181 ("Defendant's marketing was willful and with reckless disregard and was motivated by a desire to not lose market share to lactation.").

27

Abbott argues first that the CPLA precludes Hunte's intentional misrepresentation claim. *See* Abbott's Mem. of Law, Doc. No. 45-1, at 11. (Abbott makes the same argument with respect to Hunte's CUTPA claim, which I address below.) Although some courts have apparently excluded common law fraud claims based on the CPLA's exclusivity bar (also explained below),[12] many more courts have focused on whether and when the CPLA excludes parallel CUTPA claims. In any event, I need not determine whether and when the CPLA bars parallel common law fraud claims because, even if Hunte could assert an intentional misrepresentation claim here, I would dismiss it on the merits.

Hunte's allegations do not plausibly state a claim for intentional misrepresentation. More specifically, Hunte's allegations do not meet the requirements of Rule 9(b) for two reasons. First, Hunte's complaint does not satisfy Rule 9(b)'s particularity requirement. To make her intentional misrepresentation claim, Hunte relies on the statements recounted in the "marketing" section of her complaint.[13] Hunte claims that Abbott made those statements "on an ongoing and repeated basis, and specifically [as] relevant here, at various points between January 1, 2018 and February 22, 2018." Am. Compl., Doc. No. 44, at ¶ 153. But, in fact, the statements Hunte recounts in the "marketing" section of her complaint are often entirely unmoored from time and place,[14] were concededly made *well before* January 1, 2018,[15] or simply identify when Abbott

---

[12]    *See, e.g.*, *Doe v. Bausch & Lomb, Inc.*, 443 F. Supp. 3d 259, 270–71 (D. Conn. 2020) (dismissing common law fraud claim because it was "barred by the CPLA"); *Johannsen v. Zimmer, Inc.*, 2005 WL 756509, at *10 (D. Conn. Mar. 31, 2005) ("Plaintiff's fraud claim is explicitly one arising out of his personal injuries as allegedly caused by inaccurate or fraudulent marketing, packaging or labeling," so "[t]he common law fraud claim is excluded" by the CPLA).

[13]    *See* Am. Compl., Doc. No. 44, at ¶¶ 169–75 (beginning each paragraph with "[a]s a result of the marketing described above"); *id.* at ¶¶ 176–80 (beginning each paragraph with "Defendant's marketing campaign"); Hunte's Opp'n, Doc. No. 53, at 16–17 ("Plaintiff's Complaint has an entire section titled 'the marketing,' which sets forth with particularity specific allegations" supporting intentional misrepresentation claim); *id.* at 18 ("Here, the generalized marketing of Similac products was a substantial factor in the product being fed to the baby and consequently causing his injury and death.").

[14]    *See, e.g.*, Am. Compl., Doc. No. 44, at ¶¶ 30, 48–50, 56–62.

[15]    *See, e.g.*, Am. Compl., Doc. No. 44, at ¶¶ 36 (2004 advertisement), 41 (1998 report).

"began" marketing its products in a certain way.[16]  Further, as described above, nearly all of those marketing materials and misstatements regard products not at issue in this case.  *Cf. In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liability Litig.*, 687 F. Supp. 2d 897, 904 (W.D. Mo. 2009) (dismissing plaintiffs' fraudulent and negligent misrepresentation claims for failing to meet requirements of Rule 9(b) when many statements at issue were "not even statements about the products in question, but general platitudes about a particular Defendant's commitment to safety and quality or general allegations about a particular Defendant's marketing and advertising strategy").  Put simply, Hunte's theory—that she can set forth general marketing materials over a decades-long period of time and then rely on them to support an intentional misrepresentation claim—does not at all comply with Rule 9(b)'s particularity requirement.

Second, Hunte has not plausibly alleged scienter.  To do so, Hunte would need to show either "that defendants had both motive and opportunity to commit fraud," or "strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields*, 25 F.3d at 1128.  In the Second Circuit, "[m]otive . . . entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," and "[o]pportunity . . . entail[s] the means and likely prospect of achieving concrete benefits by the means alleged."  *Id.* at 1130.  Generalized motives—those that "could be imputed to any publicly-owned, for-profit endeavor"—are not "sufficiently concrete for purposes of inferring scienter."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996); *see also Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012) (explaining that a generalized motive is one that is "ubiquitous in business").  The only motive that Hunte alleges—repeatedly—is that Abbott was motivated by its desire to earn profits.  *See, e.g.*, Am. Compl., Doc. No. 44, at ¶ 27, 152(B)(i),

---

[16]  *See, e.g.*, Am. Compl., Doc. No. 44, at ¶¶ 38, 40, 52–54.

152(F)(b), 176, 184.[17]  It is almost self-evident that that "motive" is too generalized to support a strong inference of scienter.

Even if Hunte's intentional misrepresentation claim did satisfy Rule 9(b), it would still fail because Hunte has not alleged that she relied on any alleged misstatement to her detriment. Again, Hunte admits that the extent of her exposure to Abbott's "misstatements" was her "expos[ure] to" the marketing, which "enticed" her to sign up for *Similac Strong Moms Rewards*, an electronic mailing list.  *See* Am. Compl., Doc. No. 44, at ¶¶ 164, 166.  Hunte alleges that, had she known the truth, she would have told the YNHH doctors not to feed Abbott's products to Aries.  But that is too tenuous of a causal link to support the notion that Aries was injured by Hunte's reliance on Abbott's marketing.  For those reasons, I **grant** Abbott's motion to dismiss Hunte's intentional misrepresentation claim.

### C.    CUTPA (¶¶ 1–19) (pp. 58–63)

In her amended complaint, Hunte asserts a separate claim for a violation of CUTPA.  The CPLA contains an exclusivity provision:  A "product liability claim . . . shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."  Conn. Gen. Stat. § 52-572n(a).  In turn, a "product liability claim" is defined to include "all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product."

---

[17]    Hunte's attempt to evade that reality is unavailing.  Hunte points to her allegations in paragraphs 177 through 185 of her amended complaint and claims that those allegations "go well beyond a conclusory or cursory claim for profit, but rather set forth a specific scheme designed to cause moms to consume an unsafe product, lower lactation levels, achieve brand loyalty and achieve increased market share, all at the expense of lactation, and all of it to the detriment of babies."  Hunte's Opp'n, Doc. No. 53, at 19–20.  However, those paragraphs explicitly allege that the motive behind Abbott's "scheme" was a pursuit of profit.  *See, e.g.* Am. Compl., Doc. No. 44, at ¶ 184 ("Defendant has chosen profit over safety."); *id.* at ¶¶ 177–78 (alleging that Abbott's scheme causes mothers to "purchase bovine products"); *id.* at ¶ 180 (alleging that Abbott's marketing was intended to create "strong brand loyalty which will result in extended revenues over the course of years"); *id.* at ¶ 181 (alleging that Abbott's marketing was "motivated by a desire to not lose market share to lactation").

*Id.* § 52-572m(b). And "harm" is defined to include "damage to property, including the product itself, and personal injuries including wrongful death." *Id.* § 52-572m(d). Based on those statutory definitions and the CPLA's legislative history, the Connecticut Supreme Court has summed up: "[A] product liability claim under the act is one that seeks to recover damages for personal injuries, including wrongful death, or for property damages, including damage to the product itself, caused by the defective product." *Gerrity v. R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 128 (2003).

The CPLA is the "exclusive means by which a party may secure a remedy for an injury caused by a defective product." *Id.* at 126. So, if a plaintiff's CUTPA claim "falls within the scope of the product liability act," it is precluded. *Id.*; *see also Hurley v. Heart Physicians, P.C.*, 278 Conn. 305, 324–26 (2006). Determining whether a CUTPA claim is precluded by the CPLA is a flexible test, but courts should be wary of plaintiffs trying to assert a CUTPA claim that, "in reality," is "one falling within the scope of the product liability act." *Gerrity*, 263 Conn. at 129. Such a "purported CUTPA claim would be . . . nothing more than a product liability act claim dressed in the robes of CUTPA." *Id.*

However, the CPLA's exclusivity provision does not preclude CUTPA claims that seek to recover "either for an injury not caused by the defective product, or if the party is not pursuing a claim for 'personal injury, death or property damage.'" *Id.* at 128 (quoting Conn. Gen. Stat. § 52-572m(b)) (cleaned up). In *Gerrity*, for instance, the plaintiff sued a tobacco company under both the CPLA (alleging a defective product design) and also pursuant to CUTPA based on its advertising scheme. The *Gerrity* Court allowed the plaintiff's CUTPA claim to proceed because

> [i]n part, at least, the plaintiff's CUTPA claim does not seek a remedy for personal injury, death or property damage. The plaintiff seeks, rather, to use CUTPA so as to redress merely a *financial injury* suffered by the decedent, of a kind that has never been regarded as part of the traditional tort remedy for harm

31

caused by a defective product. The plaintiff alleged that the decedent was forced to pay a higher price for the defendants' cigarettes than she would have had to pay in the absence of the wrongful course of conduct allegedly engaged in by the defendants.

*Id.* at 129–30 (cleaned up).

In another recent case—the only one to which Hunte analogizes—the Connecticut Supreme Court again allowed a plaintiff's CUTPA claim to survive. *Soto v. Bushmaster Firearms Int'l, LLC*, arose from the horrible tragedy of the Sandy Hook massacre in 2012. 331 Conn. 53 (2019). In *Soto*, the administrators of several decedents' estates sued gun manufacturers and retailers for wrongful death (sounding in negligent entrustment) and CUTPA violations. (The plaintiffs did not assert a CPLA claim.) The Connecticut Supreme Court held that the plaintiffs had stated a plausible CUTPA violation on a wrongful advertising theory that "the defendants[] advertised and marketed the [semi-automatic rifle at issue] in an unethical, oppressive, immoral and unscrupulous manner," including by "encourag[ing] illegal or unsafe behavior" by promoting the rifle "for civilians to use to carry out offensive, military style combat missions against their perceived enemies." *Id.* at 65–66, 73, 99. The Connecticut Supreme Court rejected the defendants' argument that the plaintiffs' CUTPA claim should fail because it was preempted by the CPLA. The Connecticut Supreme Court wrote:

> [T]he defendants[] fail to offer any explanation as to why the allegation that they wrongfully marketed the XM15-E2S by promoting the gun's use for illegal purposes—offensive, military style assault missions—amounts to a product defect claim. There is no allegation in the present case, for example, that the marketing for the XM15-E2S contained inadequate warnings that made the weapon unreasonably dangerous.

*Id.* at 107 (cleaned up).

In my view, Hunte's CUTPA claim is "nothing more than a product liability act claim dressed in the robes of CUTPA." *Gerrity*, 263 Conn. at 129; *see also Glover v. Bausch & Lomb, Inc.*, 2021 WL 3042364, at *11 (2d Cir. July 20, 2021) ("The [plaintiffs'] CUTPA claim may

proceed only if it falls into the class of CUTPA claims permitted under *Soto* – those for

'wrongful advertising,' which are not 'masked product defect claims.'") (quoting *Soto*, 331

Conn. at 109).[18]  Hunte attempts to separate her CUTPA claim from the rest of her complaint by

re-starting paragraph numbers at "1" and claiming that her CUTPA count "is not based on any

claim that the Defendant's product was defective or unreasonably dangerous."  Am. Compl.,

Doc. No. 44, at ¶ 1 (p. 58).  But the instances of unfairness and deception that Hunte alleges in

asserting her CUTPA claim are precisely those that Hunte alleged in support of her CPLA claim

earlier in the complaint.  *See id.* at ¶ 2(a)–(p) (pp. 58–60).  More specifically, in support of her

CUTPA claim, Hunte claims that "Aries was injured and killed by the cumulative nature of

Defendant's conduct" and that Abbott's conduct led to:  (1) the YNHH doctors choosing

Abbott's products to feed Aries, (2) "mothers, and Anika Hunte in particular" allowing their

premature infants to consume Abbott's products, and (3) Hunte's diminished ability to prevent

Abbott's products from being fed to Aries.  *Id.* at ¶¶ 5–6 (pp. 60–61).

---

[18]     In *Glover*, the plaintiffs brought a CPLA claim against a producer of an optical medical device that
allegedly caused one plaintiff permanent visual impairment.  The district court denied as futile the plaintiffs' motion
to amend their complaint to include a CUTPA claim because such a claim would have been, in the district court's
view, expressly preempted by the Medical Device Amendments to the federal Food, Drug, and Cosmetic Act.  *See
Doe v. Bausch & Lomb, Inc.*, 443 F. Supp. 3d 259, 275 (D. Conn. 2020) (simultaneously declining to decide whether
the CPLA barred the plaintiffs' purported CUTPA claim).  The Second Circuit decided, instead, to address whether
"the CUTPA claim is barred by the CPLA" because, depending on the answer, "the question of federal preemption
will be moot."  *Glover*, 2021 WL 3042364, at *10.  Acknowledging *Soto*, the Second Circuit concluded that the
Connecticut Supreme Court has not yet answered whether the CPLA bars a CUTPA claim "based on allegations that
a manufacturer deceptively and aggressively marketed and promoted a product despite knowing that it presented a
substantial risk of injury," and so it certified that question to the Connecticut Supreme Court.  *Id.* at *11.
        Although I agree with the *Glover* Court that further clarification from the Connecticut Supreme Court
would be helpful in this area, in my view, the resolution of Hunte's CUTPA claim does not depend on the answer to
the *Glover* Court's certified question, nor does it present a close question given the existing state of Connecticut law.
In *Soto*—as recognized in *Glover*—the Connecticut Supreme Court explicitly remarked that the plaintiffs did not
allege "that the marketing for the [relevant assault rifle] contained inadequate warnings that made the weapon
unreasonably dangerous."  *Soto*, 331 Conn. at 107; *see also Glover*, 2021 WL 3042364, at *10 (recognizing that
CUTPA claims are preempted by the CPLA when they are "masked product defect claims") (cleaned up).  Here, for
the reasons described above, Hunte's CUTPA claim is a masked product defect claim.  Throughout her complaint—
including explicitly in her CPLA claim based on a failure to warn theory—Hunte alleges that Abbott's formulas are
defective because, in relevant part, they do not contain proper warnings.

Although Hunte cites *Soto* in her support, there are many important distinctions between *Soto* and this case. In *Soto*, the plaintiffs did not bring a CPLA claim. Here, Hunte brings a CPLA claim. In *Soto*, the plaintiffs did not allege that the rifle was defective based on inadequate warnings. Here, Hunte does allege that Abbott's products were defective based on their lack of warnings. In circumstances similar to this case, Connecticut courts have often dismissed or stricken plaintiffs' CUTPA claims. *See, e.g.*, *Appiah v. Home Depot U.S.A., Inc.*, 2020 WL 6263544, at *5 (D. Conn. Oct. 23, 2020) (dismissing plaintiffs' CUTPA claim because "[p]laintiffs are alleging the existence of a defective product in tandem with misrepresentations about the product's efficacy," and citing several cases in which courts have "stricken such 'wrongful marketing' claims when cast as CUTPA claims because they are precluded by the CPLA's exclusivity provision").

Hunte makes a series of confusing arguments in an attempt to distance her CUTPA claim from the theories undergirding her CPLA claim. First, Hunte argues that Aries "suffered as a result of Abbott's advertising—diminished availability of his mother's breast milk—[] independent of the question whether Abbott's formula suffered from a design defect or did not provide sufficient warnings." Hunte's Opp'n, Doc. No. 53, at 22. Hunte's theory, though, merely asserts that Aries suffered "personal injury . . . caused by the . . . marketing . . . of a[] product," Conn. Gen. Stat. § 52-572m(b), and so the CPLA provides the exclusive remedy for that claim. Second, Hunte argues that "Aries [] suffered for having a product that was *inferior* to breast milk," given that "Abbott misle[]d Plaintiffs to believe that its products were equivalent or superior to breast milk, and that its products were necessary for catch up growth." Hunte's Opp'n, Doc. No. 53, at 22. Again, because that claim asserts that Aries suffered personal injury caused by Abbott's marketing, Hunte cannot rely on CUTPA to bring that claim.

Third, Hunte asserts that she suffered financial loss from Abbott's conduct that was separate from the personal injury and death that befell Aries. For instance, Hunte alleges that Abbott's conduct artificially propped up—and maintained—the price of Similac products, which made consumers overpay for them. *See id.* at ¶¶ 12–14 (pp. 62–63). Hunte claims that Abbott's general conduct "has created significant financial loss to the consumers and improperly discouraged the use of mother's milk or donor milk." *Id.* at ¶ 14 (pp. 62–63). Hunte contends that she has suffered the following injuries:

> "[E]xtensive medical bills and financial loss to the parents and/or to the State of Connecticut, because the products were a substantial factor in the premature infant developing [NEC], undergoing surgeries, and increased hospitalization costs."

> "Aries and his estate[] suffered ascertainable losses and damages in the form of: (a) lost wages; (b) funeral and burial expenses; [(c)] medical bills and costs."

> "Aries and his estate[] suffered ascertainable losses and damages because the available breast milk, which was free to [] Aries' mother, was replaced in part by expensive cow's milk products manufactured and sold by the Defendant."

*Id.* at ¶¶ 15–17 (p. 63); *see also* Hunte's Opp'n, Doc. No. 53, at 22 (claiming that Hunte "suffered financial loss because breast milk, which was free to [] Aries's mother, was replaced in part expensive cow's milk products—the price of which was artificially inflated by Abbott's deceptive marketing campaign") (cleaned up).

Hunte's third argument also falls short. To be sure, when plaintiffs assert a CUTPA claim based on financial loss caused by a defendant's deceptive advertising scheme, that claim might survive if it is not based on harm caused by personal injury or death. *See Gerrity*, 263 Conn. at 129–30. But Hunte has not alleged that she suffered a financial injury distinct from the damages that flowed from Aries' personal injury and death. More specifically, Hunte does not allege that she ever bought any of the products at issue. *Cf. Childs v. Uplift Mobility Prods.*,

*LLC*, 2010 WL 796754, at *4 (Conn. Super Ct. Feb. 2, 2010) (striking plaintiff's CUTPA claim because "plaintiffs in this case cannot contend that they were forced to pay a higher price because the product came from the Veterans Administration").  The closest Hunte comes is to point to her "extensive medical bills and financial loss," "lost wages," and "funeral and burial expenses."  Am. Compl., Doc. No. 44, at ¶¶ 15–17 (p. 63).  In my view, those damages all flow from the harm that Abbott's products allegedly caused—they are not "financial losses" separate from that harm.

Again, under the CPLA, "harm" is defined to include "personal injuries including wrongful death."  Conn. Gen. Stat. § 52-572m(d).  Lost earning capacity and funeral and medical expenses are traditionally recoverable in wrongful death actions, which this case resembles.  *See* Conn. Gen. Stat. § 52-555(a) (medical and funeral expenses); *Kiniry v. Danbury Hosp.*, 183 Conn. 448, 460 (1981) (lost earning capacity).  Furthermore, Hunte's own allegations confirm that her CUTPA claim seeks damages that flowed from the harm that befell Aries.  *See, e.g.*, Am. Compl., Doc. No. 44, at ¶ 5 (p. 60–61) ("As a result of the unfair trade practices engaged in by the Defendant Abbott, [] Aries was injured and killed by the cumulative nature of Defendant's conduct."); ¶ 6 (p. 61) ("Had Defendant not engaged in the intentional, deceptive, unconscionable, immoral, and fraudulent conduct described above, [] Aries would not have been fed the product, and would not have incurred related injuries and damages.").  For those reasons, the CPLA precludes Hunte's CUTPA claim, and I **grant** Abbott's motion to dismiss it.

D.    Counts Four and Five:  Loss of Filial Consortium

In counts four and five, Aries' parents bring claims for loss of filial consortium, which are derivative of the underlying substantive torts.  *See Angeles v. State, Dep't of Children and Families*, 2017 WL 5203245, at *4 (Conn. Super. Ct. Oct. 10, 2017) ("Under Connecticut law,

36

loss of consortium is a derivative cause of action.").  Abbott's only argument regarding those two counts is that "[t]hey should be dismissed for the same reasons that the claims on which they are based should be dismissed."  Abbott's Mem. of Law, Doc. No. 45-1, at 8 n.3.  Because Hunte's CPLA claim will proceed on three theories—failure to warn, design defect, and negligence—Abbott's argument is off the mark.

It is an open question whether Connecticut law recognizes a cause of action for loss of filial consortium.  The only loss of consortium claim established by statute in Connecticut is a loss of spousal consortium.  *See* Conn. Gen. Stat. § 52-555a.  In a recent case, the Connecticut Supreme Court recognized a cause of action for loss of parental consortium, in the process overruling a 1998 precedent that held the opposite.  *See Campos v. Coleman*, 319 Conn. 36, 43 (2015), *overruling Mendillo v. Bd. of Educ. of Town of E. Haddam*, 246 Conn. 456 (1998). Since then, lower courts in Connecticut appear split regarding whether a claim for loss of filial consortium is available under Connecticut law.  *Compare Perez v. Stanford*, 2021 WL 828560, at *1 (Conn. Super. Ct. Jan. 19, 2021) (exists) *and Joshua Isaac Monroe Lynch, PPA, et al. v. State of Connecticut, et al.*, 2021 WL 3487733, at *48–49 (Conn. Super. Ct. June 28, 2021) (same) *with Zamora-George v. Yale New Haven Hosp., Inc.*, 2020 WL 1656201, at *3–4 (Conn. Super. Ct. Feb. 21, 2020) (does not exist) *and Vincent v. Yale New Haven Health Servs. Corp.*, 2018 WL 7107584, at *2 (Conn. Super. Ct. Dec. 27, 2018) (same) *and Angeles*, 2017 WL 5203245, at *7 (same).

I will certify this issue of law to the Connecticut Supreme Court because whether a cause of action for loss of filial consortium exists will "be determinative of an issue in [this] pending litigation," and "there is no controlling appellate decision, constitutional provision or [Connecticut state] statute" providing the answer.  Conn. Gen. Stat. § 51-199b(d); *see also* Hr'g

Tr., Doc. No. 57, at 11:22–24 (Abbott's counsel agreeing that issue should be certified); *id.* at 26:17–21 (Hunte's counsel conceding that this is an "unsettled" and "undeveloped area under Connecticut law"). Whether a cause of action for loss of filial consortium exists under Connecticut state law presents a sensitive issue of tort law within the peculiar province of the state, and the answer will involve weighing important policy considerations. *See Munn v. Hotchkiss School*, 795 F.3d 324, 334 (2d Cir. 2015) ("[S]tate courts should be accorded the first opportunity to decide significant issues of state law through the certification process, . . . especially where the issues implicate the weighing of policy concerns.") (quoting *Parrot v. Guardian Life Ins. Co. of Am.*, 338 F.3d 140, 144 (2d Cir. 2003)) (cleaned up); *Fraser v. United States*, 30 F.3d 18, 20 (2d Cir. 1994) (explaining that certification may be especially appropriate when "claims implicate important values in the evolution of a state's tort law"); *cf. Campos*, 319 Conn. at 43–51 (weighing policy considerations in deciding whether to recognize cause of action for loss of parental consortium). Connecticut's highest court deserves the opportunity to answer the question in the first instance. Thus, I **deny without prejudice** Abbott's motion to dismiss Aries' parents' claims for loss of filial consortium.

  E. <u>Motion to Strike</u>

  Pursuant to Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are disfavored. *See Cummings v. Bradley*, 2013 WL 1149985, at *1 (D. Conn. Mar. 19, 2013). In *Ferry*, I granted the defendants' motion to strike portions of Ferry's opposition brief that accused the defendants of killing babies for profit. *See* Hr'g Tr., *Ferry*, 20-cv-99, Doc. No.

38

82, at 51:8–52:15 (explaining my view that Ferry's argument that the defendants "were killing babies for profit" had little value and was quite inflammatory).[19]

Here, Abbott alleges that Hunte has done exactly what Ferry did in *Ferry*: According to Abbott, Hunte's counsel "*again* asserts that Abbott seeks to profit by intentionally harming infants." Abbott's Mem. of Law, Doc. No. 45-1, at 9. Abbott asks me to strike the following paragraphs from Hunte's amended complaint: 27, 143, 151, 152(F)(b), and 184. Hunte argues that those allegations are, essentially, its substantive allegations, and are relevant to Abbott's potential recklessness. *See* Hunte's Opp'n, Doc. No. 53, at 23–24. The allegedly offensive paragraphs read as follows:

> 27. Defendant Abbott routinely offers free formula and other goodies in baskets given to moms by their OBGYNs before birth and after birth in hospital and medical clinics. The impetus behind such efforts is to create brand loyalty, and create the appearance of "medical blessing" so that moms continue to use formula to feed their babies after they leave the NICU, at great expense to the parents, and substantial profit to Abbott.

> 143. Abbott knows that if they required or even requested on their product labels that their premature infant formulas, Similac, should not be fed to a premature infant until the parent is warned and informed that feeding a product could significantly increase the risk of NEC or death, then the use of the Similac products would immediately plummet in hospitals across the country because the truth and the science would finally be brought to light, and the parents would not allow the products to be fed to their infant. The brand name Similac would forever be associated with NEC and death to the detriment of the corporate image of Abbott.

> 151. The manufacturer Abbott has known that their Similac products are significantly increasing the risk of NEC and/or death in premature infants and are aware that there are alternatives to their cow's milk-based formulas and fortifiers, such as human milk derived products, that would reduce the risk of NEC and/or

---

[19] Technically, because Ferry's opposition was a brief and not a pleading, I acted pursuant to my inherent authority in striking certain statements in that brief. *See Katz v. Cellco P'ship*, 794 F.3d 341, 346 (2d Cir. 2015) ("[D]istrict courts no doubt enjoy an inherent authority to manage their dockets"); *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 150 (4th Cir. 2009) (holding that district court properly relied on inherent authority in striking portion of overlong brief); *Hlfip Holding, Inc. v. Rutherford Cty., Tenn.*, 2020 WL 6484254, at *2 (M.D. Tenn. Sept. 13, 2020).

death, yet they chose to continue to promote, market, and sell their products, causing thousands of premature infants to succumb to NEC and die.

152(F)(b).    [Abbott] [i]ntentionally ignored or avoided the more recent scientific data and studies concluding that its product was causing NEC and death so that it could continue to profit from the sale of its product . . . .

184.    Defendant has chosen profit over safety.

I **deny** Abbott's motion to strike.  The paragraphs Abbott identifies do not explicitly accuse Abbott of killing infants for profit.  They are thus markedly different from the material I struck in Ferry's opposition in *Ferry*. *See, e.g.*, Ferry's Opp'n, *Ferry*, 20-cv-99, Doc. No. 62-1, at 5 ("The Defendants clearly must know that they are killing premature infants with their product, yet they continue to provide almost no warnings and provide zero guidance to hospitals, doctors, and parents on when and how their products should be given.").

## IV.    Conclusion

For the foregoing reasons, I **grant in part and deny in part** Abbott's motion to dismiss, doc. no. 45.  The surviving claims are:  (1) Hunte's CPLA claim based on the theories of failure to warn, design defect, and negligence, and (2) Aries' parents' claims for loss of filial consortium.  In a forthcoming order, I will certify certain questions of law—regarding Hunte's CPLA claim on the failure to warn theory and the two loss of filial consortium claims—to the Connecticut Supreme Court.  To that end, as described above, the parties are instructed to file within 30 days—by **September 20, 2021**—either (1) a stipulated statement of facts or (2) a written notice indicating that the parties cannot agree on such a stipulated statement.  Abbott's motion to dismiss the claims that will be the subject of my certification order is **denied without prejudice** to renewal following the Connecticut Supreme Court's either answering the certified questions or declining to accept certification.

So ordered.

Dated at Bridgeport, Connecticut, this 19th day of August 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge